The final argument of the morning is in Appeal No. 23-1531, Dr. Tondalaya Gamble v. Cook County. Good morning. Good morning, Your Honors. May it please the Court. My name is Kate Seday, and I'm here on behalf of Appellant Dr. Tondalaya Gamble. For 10 years, Dr. Gamble was the only board-certified subspecialist in Cook County's Stroger Hospital's OB-GYN department who was required to cover OB-GYN generalist responsibilities. That is what she was hired as, though, right? That is the title she was hired under, yes. And it's my understanding that the department did not have a formal separate division for urogynecology, is that correct? That's correct. The department had a urogynecology clinic, which at the time was covered by a part-time urogynecologist and provided urogynecology services in the OR. But they didn't, like, you might have, you know, gynecological, what do I want to say, oncology. They did have some specialty subdivisions into which you might hire somebody. Correct. Okay. Correct. So is the problem that she had to continue servicing, continue working as a generalist beyond the 12 to 18 months that seemed to have been discussed when she's originally hired? Or, I mean, what, why should we see this as anything but a case of a county hospital trying to stretch its resources as far as it can? Your Honor, this is more than that, because when Dr. Gamble was hired, it was with the specific intent that she be allowed to help take over the backlog of urogynecology patients that were being serviced by a part-time urogynecology subspecialist. Who they eventually lay off, I know that. But isn't that exactly what she did, though, until she complains that she's really being pulled in too many directions? No, Your Honor. She did that, and she also did all the responsibilities of an OBGYN generalist. Now, defendant contends she took on those generalist responsibilities because that was the title she was hired under, and that was the job description applicable to her role. But the record reflects that everyone knew she was working beyond the scope of the generalist title. She was what they referred to, and she was the only physician in the entire department who they referred to as a quote-unquote episodic generalist, which meant that she had to cover on-call OB duties, delivering babies. She had to cover generalist-related clinics. And on top of that, she was the only physician for nine of her ten years at the hospital who also had to cover the certified subspecialty urogynecology clinic. Can I offer an observation? That all strikes me as quite accurate from reading the briefs. The conclusion that I take away from that is a couple-fold. One, very competent doctor, very committed, indeed so committed that she was just being pulled in too many directions, that she was trying to work in this area of specialty for her even though Stroger didn't set it up formally urogynecology as a specialty department. And then she had these generalist responsibilities that went along with it, so she's just kind of burning it at both ends and then eventually says, I just can't do it anymore, and then left. The harder part, if that narrative is right, the hard part about it is to see the discrimination in it. Sure. And I appreciate the question, Your Honor, because number one, Dr. Gamble is a talented and committed physician. But number two, the real heart of the issue here is that for the ten years she was at Cook County, she was paid less than her white subspecialist counterpart and also less than her white generalist counterpart. Counsel, what role, if any, did her superiors, Dr. – is it Abrego or Abreo? Abrego. Abrego and Dr. Lynn have in setting her compensation. So they had no role in setting her initial compensation as far as we know. The interesting point in this case is that the defendants have not identified who made the decision as to what she would be paid when she was hired. And so they haven't identified any legitimate nondiscriminatory justifications for what she was paid at the time she was hired either. What Dr. Abrego and Dr. Lynn did have control over was whether or not they sought to reclassify her to a subspecialist to reflect the work she was actually doing. And she did ask repeatedly to be reclassified into a subspecialist position. And if she were reclassified into a subspecialist position, her compensation would increase? Her compensation should increase because, number one, she would no longer be subject to the collective bargaining agreement applicable to generalist OBGYNs. And, number two, every subspecialist in the department was paid considerably more than Dr. Gamble. So, for instance, Dr. Rosenzweig, the only other board-certified urogynecologist working in the division at any point in her 10 years there, was working a part-time, a .5 full-time position. So just focusing on Dr. Abrego and Dr. Lynn, then your claim with regard to their role, with regard to the fact that she received less compensation, is limited to their role in deciding whether or not to reclassify her? Because there's nothing in the record that establishes they had any other role in her compensation other than that. Is that correct? Correct, Your Honor. They're also responsible for not taking her out of the subspecialist responsibilities once she said, as Judge Scudder has noted, she's being pulled in too many directions. She did prefer initially to handle the subspecialty responsibilities. So did they classify people in subspecialties that were not treated as separate divisions? There were, if I understand your question correctly. You agreed that there was no urogynecology sub-department, or whatever I should call it. So I'm just wondering, did you get classification as a subspecialist for a wider variety of subspecialties than existed in the department? No, Your Honor, I don't believe so. There are some sort of fellowship-related trainings that general OBGYNs can do where they will be listed as having sort of an expertise in something. Well, she had done a fellowship in urogynecology, and she becomes a certified board certified about two or three years after she reaches Cook County. As soon as the test was available to be taken. Right, right. But the point is that the subspecialists within the division ran their own clinics. So there was an OBGYN oncology department. I believe there was one related to genetic issues. So is the problem that they didn't create a department for urogynecology? No. What's the slot that they should have put her into? The slot they should have put her into was Dr. Rosenzweig's slot as soon as they laid him off. So they hired Dr. Gamble to assist with Dr. Rosenzweig's urogynecology backlog, and within a year they let him go. So she was solely responsible for covering his patients and hers, and there was a need. The record is replete with evidence that there was a backlog of patients. That seems clear. I mean, I don't question that at all. And when she said, I can't do all of this, in 2013 she started to say to Dr. Lynn and Dr. Abrego, I cannot do all of this. So if you're not going to reclassify me as a subspecialist, you're not going to give me the title and the pay, then please, let me just be an OBGYN generalist. I'll take a call. I'll cover the generalist clinics. I will no longer be responsible for these certified subspecialty responsibilities, and they ignored that. And so during that time, was she working beyond the 50 hours that the CPA limited her work hours to be? The record's not clear on that, Your Honor. I suspect she was. I suspect if I asked her that, she would have been working beyond the 50 hours. To be fair, my guess is that many of the physicians within that department were working beyond the 50 hours just because of how stretched everyone in a county, in a public hospital is. The issue is not necessarily the number of hours as much as it is the level of responsibility. There were no other OBGYN generalists who were held to be responsible for this level of patient care. It's clear that other generalists helped her in the urogynecology clinic. They met with her follow-up patients. They did some presurgical conversations, but they couldn't actually treat these patients in this level of expertise. We'll give you a minute or two on rebuttal. When she left, am I right that the record showed, at least with respect to the generalist OBGYN physicians, that she was the highest paid among the generalists? I believe that the record does reflect that. What the record does not reflect is anything about how those other individuals' pay rates were set when they were hired or how their experience compared to Dr. Gamble's. Does the record reflect, though, where she stood vis-a-vis those that were assigned to the groups you were talking about, like OBGYN oncology, the family planning group, endocrinology, et cetera, the formal specialized groups? It likely does, but because we've not tried to establish that an OBG oncologist, for instance, is her comparator, it's not at issue in this particular appeal. But I will say that when she resigned in 2019, which was 10 years after she was hired, she was still making approximately $81,000 per year less than what the only other urogynecologist had been making in 2009. So that's when you take his half-time and then you multiply it times two. Correct. What's his name? Rosenzweig. Rosenzweig, yeah. Okay, we'll give you a couple minutes on rebuttal. Thank you, Your Honor. All right. Ms. Harvey, good morning. Good morning. My name is Colleen Harvey. May it please the Court, my name is Colleen Harvey. I represent defendants Cook County, Dr. Fidel Abrego, and Dr. Edward Lynn. The district court's order granting summary judgment to defendants should be affirmed. As we discussed, Dr. Gamble was a generalist physician in Stroger Hospital's OB-GYN department. But it seems in name only. It seems that she was not only assuming the positions of a subspecialist in urogynecology, but she was highly qualified to do so, first of all, having completed a fellowship upon the hiring, and then later getting board certified. So she was spending a lot of time doing highly specialized work. Well, she was doing both. She was doing her generalist duties as far as the overnight on-call shift for the OB department, as well as the- Yeah, that makes it almost worse for you, though, doesn't it? I mean, it seems that her pay should have, even in the context of the CBA, should have reflected this additional credential. It should have brought her up to a higher level. Well, the OB-GYN, the urogynecology clinic was under the general OB-GYN division, and it was regularly staffed by generalists. And I understand Gamble's argument to be that it should have been treated as a subspecialty clinic, but it was not. And, you know, that's within the hospital's discretion to decide how it should be, you know, as far as a business decision. Ms. Harvey, the part of the brief that I really paused on, maybe you can help me with this a little bit. Is, let's focus on Dr. Rosenzweig, okay? I know he eventually left when they downsized and he was let go. You make the point in the brief that the law- I'm looking at page 13 of your brief, okay? You say, well, look, they're really not the same at all because Dr. Gamble was working full-time and Dr. Rosenzweig was working part-time. And then from there you say that it's very well settled in the law that full-time employees are not similarly situated to part-time employees. I chased down those citations, and I'm not sure that's what those cases say. And the reason I chased the citations down is it doesn't make much sense to me that you could say, Well, the part-time, you know, white employees are making more per hour than the full-time black employees. But there's no Title VII issue whatsoever because one group works half-time and one group works full-time. That makes no sense to me at all. So can you explain the full-time, part-time distinction point that you all are trying to make? Sure. Well, the issue is that they're not comparable as far as who was setting their salaries and the hours that they worked. But can I tell you things that seem missing in the record to me on this very point? I could imagine, but it's not in this record, you trying to say, Well, actually the part-time employees don't get the same kind of health care benefits, or they don't get the same kind of contributions to pension, or they don't get the same, you know, vacation benefits or something, that it's much more of a piece work thing. None of that's in the record. The real salary for a full-time employee is kind of 1.3, you know, what they think their salary is, because by the time the employer's paid all these taxes and other stuff, the true cost of the employer's more. Nothing like that is in the record. So we're left with what we have, which is, you know, here's the rate that somebody was working a half-time number of hours, presumably 25 hours a week, and here's the rate somebody's working the full 50, and you can extrapolate very easily by multiplying times two, and it turns out he's being behaved much better than she is. He also was hired into a different role. It was a part-time position, and he was not a generalist in the OB-GYN general. Isn't that developed, though? I was focused on the exact same thing that Judge Wood was. How are these two people different? Because at least the impression that the briefing leaves is that the only real difference between them, maybe two differences, one's working full-time, one's working part-time, and then there's a reference not developed that he's not subject to the same CBA employment wage scale because he's not a member of the same union or maybe not a member of a union at all. That's it. Nobody else develops this. There is no evidence in the record that he was a member of the union, and that's a material difference. Dr. Gamble's pay was subject to the collective bargaining agreement. She received regular pay increases per the collective bargaining agreement, whereas Dr. Rosenzweig left employment in 2010, so they only really worked together for less than a year. So does the fact that you're responding that way, Ms. Harvey, don't let me put words in your mouth. Are you backing off the distinction, hold everything else equal? Full-time, part-time distinction is a material differential between workers? No, I believe that it is a material difference between workers. Really? Yes. And so how do you handle my hypo of the white hourly rate being full-time rate, being greater than the black part-time rate, everything else is equal? Again, the difference is they were performing different duties. Dr. Gamble was a full-time employee, but they weren't. Now you're changing the hypo. In other words, keep every single fact the same, and the only thing that is different is the pay differential and the race. And the record also shows that they had different levels of experience. Hold on, hold on. Just answer my hypothetical. The position of the county is that for Title VII purposes in comparison, it is material, full-time, part-time, without asking any other question. I do believe that it is material, and in this case, they were hired by different individuals. Dr. Rosenzweig was there when the decision was made. You're adding too many facts to Judge Scudder's hypothetical, because we need to start with a baseline. Are these the same or different? I mean, it's very hard to see how they are if you assume that people are doing the same job, they have the same number of years of experience, they need the same board certifications, all the factors that you can put in there. So you need to hold all of that equal and say Person A is working half-time, Person B is working full-time. Why are they doing different jobs? Because they're... Because they're not in the building as many hours? I mean, that seems crazy. Dr. Rosenzweig, according to the record, was hired for a specific purpose, to assist in the urogynecology department. So all of those arguments make sense to me, but you seem to be delivering them right from the podium. They don't seem developed in the record. The point that comes, maybe I've misread the briefs, but the point that you seem to make in the briefs is that, hey, they're night and day different. Why are they night and day different? Because he's part-time, she's full-time. That leads to my hypothetical. And it is in the record that Dr. Rosenzweig was not performing generalist duties. He was not reporting to Dr. Abrego. That suggests that she's getting her salary depressed because she's working some generalist duties, even though she's an episodic generalist, even though one of the reasons they want her is that she can help Dr. Rosenzweig in this subspecialty area. I'll just call it an area since it's not a fully recognized subpart. But I'm not sure that it helps you that he's not performing generalist duties. Well, ultimately, though, there is evidence in the record that they are different, that they were hired by different individuals, they were hired at different times for different purposes. Is there evidence that Cook County sort of has a slush fund of money that it can throw at half-time employees that it's not able to devote to their full-time physicians? No, but, again, there is evidence in the record that he was laid off in 2010 because he was part-time. That is a reason why he was laid off. So they do have some discretion outside the boundaries. Probably the CBA must have some protections against being laid off. Yes. Okay. Overall, here, Gamble has not presented evidence upon which a rational jury could find the defendants took adverse actions against her because of her race. There is no evidence of racial animus on the part of defendants. Lynn and Abrego, while they were involved in hiring Gamble, it's undisputed they were not involved in setting her salary. Can I interrupt you right before you run out of time about this pay adjustment that she gets when the union helps her grieve and there's this $26,000. I take it that was added to her base pay, not just at one time, $26,000. Yes, my understanding is that. Okay. And what explains that? It was a grievance alleging race discrimination. It was a grievance alleging discrimination. But, again, it's not admissible as far as the record is not developed as far as why the county settled. And it was a settlement. It's not admissible as far as why they settled. And that is not in the record. Plaintiff uses it to imply that the county was purposefully increasing her pay just to get her up to Fish's Pay, which is another alleged comparator. Right, Fish's Pay. And there is no evidence in the record that the county considered Fish's Pay when they made that decision. Before we let you go, can I ask you one question? When you're articulating what you see as these differences between Dr. Gamble and Dr. Rosenzweig, what evidence are you thinking about? In other words, after the argument, if we want to go look in the record, where would you tell us to go look? Well, there is deposition testimony from Dr. Lynn and Dr. Abrego as far as Dr. Rosenzweig's qualifications, as well as I believe Dr. Gamble in her deposition admitted that when she worked with Dr. Rosenzweig, he had a significant amount of urogynecology experience. Okay. Okay, very well. Thank you. We, again, defendants ask that you affirm the district court's decision. Thank you. You're quite welcome.  Ms. Sade? Just briefly, Your Honors, the similarly situated inquiry is essentially supposed to be a pretty simple test. Are there enough meaningful factors that we can look to for a reasonable fact finder to find a reasonable comparison? In this case, Drs. Rosenzweig and Gamble had the same type of training and experience. They performed the same kind of work. The only differences the defendant has pointed to is that, frankly, plaintiff Dr. Gamble performed more work because she had to cover the generalist responsibilities as well. For that reason, the two are certainly similarly situated, and we would ask that the lower court's decision be reversed, summary judgment be denied, and that Dr. Gamble get her chance at a trial. Okay. Very well. Thanks to counsel for both sides. We'll take the appeal under advisement. That concludes the day's arguments. The court will be in recess.